## COUNTY OF HANCOCK.

† Jordan *& al. versus* Woodward *& al.*

By the Constitution of the State, it is provided that *private* property shall not be taken for *public uses* without just compensation; nor unless the *public exigencies* require it.

The authority to flow lands by maintaining a water-mill, under c. 126 of the Revised Statutes, if it were a new question, might well be doubted, as coming in conflict with the rights secured under this constitutional provision.

Even the reasons for the policy which occasioned such legislation, have ceased to be potential, and although from the long and uninterrupted exercise of the rights of mill-owners under this Act, it must be considered constitutional, yet no extension of their rights over private property can be allowed by *implication.*

Thus, the riparian proprietor of lands overflowed by means of a dam for the working of a water-mill, may occupy the land so overflowed, by erecting piers thereon and constructing booms, and thereby exclude the mill-owner from making it a depository of lumber for his mills.

BILL IN EQUITY, praying that defendants might be enjoined from completing piers upon their land overflowed by a mill-dam, and from constructing booms upon the mill-pond where the complainants had been accustomed to boom the logs for supplying their mills.

There was a hearing of the case at *Nisi Prius,* before HATHAWAY, J., when a temporary injunction was granted.

The respondents subsequently filed a demurrer to the bill, and the case came up for argument before the full Court.

All the essential facts in the case are stated in the opinion of the Court.

The question was as to the rights of the riparian proprietor to the use of his land *overflowed* by a dam for a water-mill, for his own exclusive benefit, but not inconsistent with the raising and using the water for the operation of the mill.

*Rowe & Bartlett,* for complainants.

The plaintiffs as owners of two mills upon this dam, under the deeds set forth in the bill, had a right to the use of two-fifths of the mill-pond created by the erection of the dam. The riparian proprietors, as such, had no right to the use of the water thus flowed back by the dam and retained for the use of the mill. The owners of the mills are the lessees, by force of the statute, or otherwise, of so much of the land of the riparian proprietor, as is covered by the pond. The accumulated waters are for the mill.

If the riparian proprietor grant to a mill owner the right to raise a head of water for his mill, by flowing back on the grantor's land, such grant carries with it, the exclusive right to the use of the pond thus raised, so far as the same may be necessary for the purposes of the mill. Broom's Legal Maxims, 198; Shep. Touchst. 89; *U. S.* v. *Appleton,* 1 Sum. 491.

The express or implied grant of an easement is accompanied by certain secondary easements, necessary for the enjoyment of the principal one. Gale & Whately on Easements, 231.

A pond of water is as necessary to a saw-mill, for the keeping of the logs and floating them to the slip, as for the turning of the wheels.

The bill alleges the necessity of the pond for these purposes, and the demurrer admits it.

Our statute, c. 126, R. S., operates as such grant from a riparian proprietor, and has the same force and effect. It gives a right to raise water for working a mill, and that word "working" should receive a liberal construction, and cover any use of the water essential to the profitable employment of the mill.

This is a proper case for the interposition of a court of equity, the facts being admitted by the demurrer. The nuisance is not completed, but threatened. The injury is prospective. The case calls for a prevention and not a remedy, and is similar in principle to that of *Moor* v. *Veazie*, 31 Maine, 380.

But if owners of mills cannot exclude riparian proprietors from the use of their mill-ponds, still this injunction should be continued.

The riparian has no right to sink piers into a mill-pond, for that would diminish its capacity. The demurrer admits the sinking of four already, two of which are on the plaintiffs' booming ground. Without these piers the booms cannot be swung. By enjoining them from completing their piers, most of the damage feared by plaintiffs will be prevented. The piers are one step towards doing the plaintiffs irreparable injury.

*Peters*, for respondents.

All the rights of complainants as mill owners are to use the head of water at the dam, with the right of keeping the water back until they want it, while all the other use and profit of the stream remain in the owner of the land overflowed.

Sect. 1 of the mill Act specifies the purpose for which the dam may be erected, and necessarily limits it to what is expressed. Every right of the owner of the land not taken away expressly, remains in him.

The provision for damages contemplates nothing more than the injury to the land. This view of the statute is sustained by the case of *Palmer Co.* v. *Ferrill*, 17 Pick. 66.

If the construction contended for is correct, the land owner ought not to have yearly damages, but pay for his land.

The defendants' view is also sustained in *Monson* v. *Brimfield Man. Co.*, 17 Pick. 77.

But if the defendants' view is erroneous, the plaintiffs are

limited under their deed to one-fifth of the water power, as a *power*.

The claim here is not to run logs in the stream, but the right of making the pond over defendants' land a place for their deposit.

Even if the objections named are not tenable, the bill ought not to be maintained, as here is a dispute as to legal rights which ought first to be settled at law. This is shown by a previous suit between these parties.

Until the legal right is settled, there is no reason why defendants should be enjoined from using their booming ground as claimed.

RICE, J.—From the bill and accompanying documents, including the plan referred to at the argument, it appears that, in 1840, Seth Tisdale and his associates were possessed of a mill privilege on Union river, in the town of Ellsworth, upon which they erected what is now known as the "Five Saw Dam," and constructed thereon three single and one double saw-mill. The single saw-mill now owned by the defendant Woodward, is located on that dam, upon the west side of the river; the two remaining single mills, owned by the plaintiffs, and the double mill, are on the same dam, but on the east side of the river. The title to those several mills have passed through sundry mesne conveyances to the present proprietors, each saw being entitled, according to the terms of the several deeds, to one-fifth of the water power created by the dam.

On the west side of the river, and immediately above the dam, the land was owned by the defendant Melvin, and constitutes a considerable portion of the basin for the mill-pond.

This pond has heretofore been used by the owners of the several mills on this dam for booming logs, and has been apportioned among the different proprietors of the mills in such way as was supposed would accommodate the different

mills, without particular reference to the proprietorship of the soil under the water.

One of the defendants owning the mill on the west side of the river and the other being the riparian proprietor of the land on the west side of the pond, claim the right to occupy, for the purpose of booming logs, the whole of this part of the mill-pond, except certain projecting points which overlies the land of the defendant Melvin, and have commenced sinking piers for the purpose of erecting a boom which will include such part of the pond. This boom, if completed, as intended by the defendants, will include a portion of the pond, now, and heretofore, occupied by the boom of the plaintiffs, used to hold logs to be manufactured at their mills.

The question presented for decision is, whether the riparian proprietor can use his lands, when overflowed by water raised by a mill-dam, for the purpose of booming logs, and may, by constructing a boom with piers thereon, exclude the general owner of the dam, by which the water is raised, and also fill up a portion of such pond, with his piers or otherwise.

Section 1 of c. 126, R. S., provides that any man may erect and maintain a water-mill, and a dam to raise water for working it, upon and across any stream that is not navigable, upon the terms and conditions, and subject to the regulations expressed in that chapter. The fourth section provides that the height to which the water may be raised, and the length of time during which it may be kept up in each year, shall be liable to be restricted and regulated by the verdict of a jury or report of commissioners. The fifth, and following sections, provide the mode by which any person sustaining damages in his lands by their being overflowed by a mill-dam, may obtain compensation.

The plaintiffs contend that as an incident to the right given them by the statute to raise the water for working their mills, is the right to use the water thus raised, and the land under it, for all purposes which will contribute to the con-

venient and profitable operation of their mills; and that thus they have acquired the right to erect and maintain booms in which to secure logs designed for manufacture at such mills, in any part of the pond thus raised, irrespective of the ownership of the lands overflowed, and upon which such booms are erected.

In direct terms the power is conferred upon the mill owner, by the statute, to erect and maintain a dam to raise water for working his mills, and incidental to this power is the right to overflow the lands of other persons, or to speak more accurately, this power of building dams may be exercised, though incident thereto, the lands of other persons be overflowed and injured. This right is in derogation of the common law, and the natural right of the citizen, and should not therefore be extended by implication. The liability of the mill owner, in case he exercises the power conferred by the statute, is the payment of damages, occasioned by *overflowing* the lands of the riparian proprietor. *Palmer Co.* v. *Ferrill,* 17 Pick. 58.

The right of the riparian proprietor is to obtain compensation in damages, for the injuries sustained in his lands, by their being *overflowed,* and nothing more. Thus the liability to pay damages by one party, and the right of compensation by the other, are commensurate, one being the counterpart of the other.

The plaintiffs further contend, that under the mill Act, they have acquired the right to the use of the basin which contains the water raised by their dam, and that no person can lawfully place any obstruction therein by which its capacity to contain water will be in any degree diminished. There are expressions in the opinion of PUTNAM, J., in the case of the *Boston & Roxbury Mill Co.* v. *Newman,* 12 Pick. 467, which appear to sustain this position. The peculiar facts and circumstances in that case, may, and probably did authorize the conclusions to which the Court arrived. But some expressions of the learned Judge in that opinion, introduced by way of argument and illustration, if relied

upon as principles of general application, may well challenge consideration.

Private property shall not be taken for public uses, without just compensation; nor unless the public exigencies require. Const., Art. 1, § 21.

The private property of one citizen cannot be taken and given to another citizen, for private uses. Except for public uses, private property may not be taken by the dominant power of the State; nor for public uses without just compensation; nor even then, unless the public exigencies require. That is to say, there must be a pressing public necessity, to justify the invasion of private right by the superior power of the State, and this exercise of power over private property, when justified by the public necessities, cannot be extended beyond what the public exigencies require.

The mill Act, as it has existed in this State, pushes the power of eminent domain to the very verge of constitutional inhibition. If it were a new question, it might well be doubted whether it would not be deemed to be in conflict with that provision of the constitution cited above.

In the early history of this country, the erection of mills was deemed matter of great public convenience and necessity, and as such deserving the special protection of the legislative power. There were then few mills in the country, and little capital with which to construct them, while land was abundant, and to a great extent unoccupied, and comparatively of little value. Hence the origin of the policy, and the grounds of its justification or excuse.

But the reasons in which this policy originated have long since ceased to exist. Private capital has largely accumulated, and now seeks investment in mills of various descriptions, or in other enterprises for private gain. That the existence of water-mills is matter of public convenience at this day, is undeniable; so too is the existence of the shop of the smith, the store of the grocer, the house of the inn-holder, and a great variety of business enterprises in which our

citizens employ their labor and capital. In fact there is no branch of lawful business which may not contribute to the public good, and for which there may not, to a certain extent, exist a public necessity. Yet to authorize the appropriation of private property for all these various purposes, would be destructive to private rights, and unsettle the tenure by which property is holden.

Strictly speaking, private property can only be said to have been taken for public uses when it has been so appropriated that the public have certain and well defined rights to that use secured, as the right to use the public highway, the turnpike, the public ferry, the railroad, and the like. But when it is so appropriated that the public have no rights to its use secured, it is difficult to perceive how such an appropriation can be denominated a public use.

We do not intend to question the authority of the existing mill Act of this State. From its great antiquity, and the long acquiescence of our citizens in its provisions, it must be deemed to be the settled law of the State. Nor are we inclined to extend its peculiar provisions by implication. It is not believed that there is any existing public exigency which requires this Court to determine, that the proprietors of the many thousands of acres of land, in this State, now overflowed by the operation of mill-dams, should be prohibited from all beneficial use of such lands by which the capacity of mill-ponds may be diminished; nor that the sinking of a pier, or the driving of a pile in a mill-pond, by the owner of the land overflowed, is an unlawful act.

Should it be said, that under this construction the capacity of the basins of mill-ponds may be materially diminished, the answer is, that from the nature of the case there is little danger to be apprehended from that source; that it does not restrict the right of the mill-owner to raise his head of water; and if by the exclusion of the water from the land of the riparian proprietor his damages should be diminished, the mill-owner may be relieved to that extent, under the provisions of c. 126, R. S.

It not appearing from the allegation in the plaintiff's bill, that the several acts of the defendants, of which complaint is made, were not all done and performed upon their own land, nor that any of said acts are in contravention of any law of this State, no sufficient cause is shown for the intervention of this Court, as a court of equity, by injunction or otherwise. *Bill dismissed.*

TENNEY, J., concurred in the result.